IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| JENNIFER L. HUFT,<br><br>                        Plaintiff,<br><br>        vs.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security<br>Administration<br><br>                        Defendant. | CV 16–58–M–JCL<br><br><br>ORDER |

Plaintiff Jennifer Huft brings this action under 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security terminating her disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401et seq.

I.      **Procedural Background**

Huft applied for disability insurance benefits in March 2004, alleging disability since February 2003 due to an organic mental disorder and posttraumatic stress disorder (PTSD). Her claim was approved in January 2005, and she was awarded benefits dating back to the alleged onset date.

In May 2013, the Social Security Administration conducted a continuing disability review[1] and determined that Huft's medical condition had significantly improved, such that she was no longer disabled as of April 16, 2012. Huft appealed the cessation of her benefits, and requested an administrative hearing before an ALJ. After a hearing, the ALJ issued a decision finding that Huft's condition had improved and she was able to work. The ALJ concluded that Huft's disability ended as of April 16, 2012, and her benefits had been properly terminated. The Appeals Council later denied Huft's request for review, rendering the ALJ's decision the agency's final decision for purposes of judicial review.

Huft was 26 years old when she began receiving benefits in February 2003, and 35 years old when her benefits were terminated in April 2012. She was 37 years old at the time of the ALJ's decision.

## II.    Standard of Review

This Court's review is limited. The Court may set aside the Commissioner's decision only where the decision is not supported by substantial evidence or where the decision is based on legal error. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial

---

[1]  Under the Social Security Act, a claimant's eligibility for benefits is subject to periodic review. *See* 42 U.S.C. § 423(f); 20 C.F.R. § 404.1594 (2006).

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Widmark v. Barnhart,* 454 F.3d 1063, 1070 (9th Cir. 2006).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). This Court must uphold the Commissioner's findings "if supported by inferences reasonably drawn from the record." *Batson v. Commissioner of Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004). "[I]f evidence exists to support more than one rational interpretation," the Court "must defer to the Commissioner's decision." *Batson*, 359 F.3d at 1193 (*citing Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999). This Court "may not substitute its judgment for that of the Commissioner." *Widmark*, 454 F.3d at 1070 (*quoting Edlund*, 253 F.3d at 1156).

## III.   Burden of Proof

Where, as here, a claimant has received a favorable disability determination, the Commissioner can terminate benefits only if substantial evidence demonstrates medical improvement such that the claimant is able to engage in substantial gainful activity. 42 U.S.C. 423(f); 20 C.F.R. § 416.994(b); *Murray v. Heckler*, 722 F.2d 499, 500 (9th Cir. 1983). The applicable regulations define medical

improvement as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 416.994(b)(1)(I). "A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)." 20 C.F.R. § 404.1594(b)(1).

Accordingly, to determine whether Huft''s disability had ceased, the ALJ was required to compare the current medical severity of her impairments to the severity of those impairments at the last time the Commissioner found her disabled. 20 C.F.R. § 404.1594(c)(3)(v). The most recent favorable medical decision, also known as the "comparison point decision," in this case was the disability determination dated January 13, 2005. (Doc. 7-2, at 14). To find that a claimant's disability does not continue through the date of the decision, the ALJ must establish that the claimant has experienced medical improvement that would allow her to engage in substantial gainful activity. 20 C.F.R. § 404.1594(a); *Murray v. Heckler*, 722 F.2d 499, 500 (9th Cir. 1983).

In determining whether medical improvement has occurred, the ALJ follows an additional eight-step process. 20 C.F.R. § 404.1594. Medical improvement is "any decrease in the medical severity of [a claimant's] impairment(s) which was

present at the time of the most recent favorable medical decision that [the claimant] was disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). "Once a claimant has been found to be disabled,...a presumption of continuing disability arises in [the claimant's] favor and the Commissioner "bears the burden of producing evidence sufficient to rebut the presumption of continuing disability" and establishing medical improvement. *Bellamy v. Sec'y of Health & Human Services*, 775 F.2d 380, 1381 (9th Cir. 1085).

## IV.   <u>ALJ's Findings</u>

Adhering to the sequential evaluation process applicable in disability termination cases, the ALJ first found that Huft had not engaged in substantial gainful activity through April 16, 2012, the date her disability ended.  (Doc. 7-2, at 14); 20 C.F.R. § 404.1594(f)(1).  He then determined at step two that Huft suffered from PTSD, cognitive disorder not otherwise specified, migraine headache disorder, and status post right wrist/shoulder fracture, but that those impairments did not meet or equal the severity of any impairment described in the Listing of Impairments.  (Doc. 7-2, at 14); 20 C.F.R. § 404.1594(f)(2).  At step three, the ALJ found that medical improvement had occurred as of April 16, 2012. (Doc. 7-2, at 17); C.F.R. § 404.1594(f)(3).  The ALJ next found that Huft had the residual functional capacity to perform a restricted range of light work as of April 16,

2012, and consequently concluded at step four that her medical improvement was related to her ability to work. (Doc. 7-2, at 17-26); 20 C.F.R. § 404.1594(f)(4). The ALJ ultimately concluded that although Huft could not perform past relevant work, she was not disabled after April 16, 2012, because there were other jobs existing in significant numbers in the national economy that she could perform, including unskilled light level work as an office helper, business mail clerk, or light packager. (Doc. 7-2, at 26-28); 20 C.F.R. § 404.1594(f)(7),(8).

## V.   Discussion

Huft challenges the ALJ's determination that she was not disabled after April 16, 2012 on several grounds. She argues the ALJ (1) erred by finding her disability ended in April 2012 due to medical improvement; (2) did not give proper weight to the opinion of treating psychologist Dr. Nancy Errebo; (3) did not provide germane reasons for discounting the opinion of nurse practitioner Beth McGee; (4) failed to set forth clear and convincing reasons for finding her only partially credible; (5) failed to fully and fairly develop the record by calling a medical expert; and (6) did not give germane reasons for discounting lay witness testimony.

### A.   Medical Improvement

Huft first argues the ALJ's finding of medical improvement was flawed

because mental status examination reports by Dr. David Young in September 2004 and Dr. John Harrison in September 2012 were essentially the same, with both showing similar working memory test scores and mostly mild to moderate limitations. (Doc. 7-8, at 64; 7-9, at 32 & 154).

In September 2004, Dr. Young evaluated Huft's cognitive and emotional functioning, and completed a medical source statement of her abilities to perform mental work related activities on which he found that Huft had mild limitations in most categories. (Doc. 7-8, at 74-84). In September 2012, Dr. Harrison performed a comprehensive neuropsychological evaluation, and found based on the testing he administered that Huft had at least average intellectual ability with generally average verbal- language and visual-spatial functioning. (Doc. 7-9, at 158). He found that Huft had reasonably intact executive functioning, but noted some variation in attention and working memory abilities, which was more consistently impaired across several tasks. (Doc. 7-9, at 158). Dr. Harrison diagnosed Huft with fairly marked depression, anxiety, and somatization. (Doc. 7-9, at 158). In February 2014, Dr. Harrison completed a medical source statement of Huft's ability to perform mental work-related activities. (Doc. 7-10, at 49). Citing the results of the neurospsychological testing he had previously administered, Dr. Harrison found that Huft had mostly mild and some moderate

limitations.  (Doc. 7-10, at 49-50).

The fact that many of Dr. Harrison's findings in February 2014 were similar to those made by Dr. Young in September 2004 does not mean the ALJ erred in finding based on the record as a whole that Huft's overall level of functioning had improved.   Dr. Harrison's assessment of Huft's ability to perform mental work-related activities supported the ALJ's determination that she was capable of working, and the record contains substantial additional evidence supporting a finding of medical improvement after Dr. Young's evaluation in September 2004 and the comparison point decision in January 2005.

To begin with, the ALJ noted that there were no medical records between May 2005 to May 2010.   As of May 2010 and thereafter, findings on physical and mental status examinations were mixed.  Many of those findings were unremarkable, and progress notes reflect that Huft's condition improved with treatment.  In November 2010, for example,  Huft established care with nurse practitioner Beth McGee, at which time her neurologic exam was largely unremarkable.  (Doc. 7-8, at 209-11).  By February 2011, Huft's headaches had decreased and she told McGee she was considering returning to work.  (Doc. 7-8, at 8). And when Huft began physical therapy for shoulder pain in March 2011, her physical examination was again largely unremarkable.  (Doc. 7-8, at 195).  Notes

from Huft's more recent mental status examinations contain many positive findings. In September 2011, for example, she was described as cooperative, calm, and alert with fluent speech and intact memory. (Doc. 7-8, at 200).

As Huft points out, the record also contains negative clinical findings and reflects her subjective complaints of pain and mental limitations. While Huft offers an interpretation of the medical evidence that differs from the ALJ's, it was wholly within the province of the ALJ to weigh the medical evidence and resolve any conflicts. See *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

In doing so, the ALJ reasonably relied on examining and reviewing physicians whose opinions indicated Huft was capable of working. In March 2012, for example, Dr. Patricia Webber performed a consultative mental status evaluation and concluded that Huft's cognitive and emotional issues were not a "major hurdle to employment." (Doc. 7-9, at 28). Dr. Webber noted that Huft did well on most of the mental status examination, and noted that while she had some issues related to men and the anniversary date of being assaulted by a former boyfriend, she did not meet the criteria for PTSD. (Doc. 7-9, at 28, 31). Dr. Webber diagnosed Huft with a cognitive disorder not otherwise specified, but described her as organized and expected she would be a reliable employee. (Doc. 7-9, at 28). State agency physician Dr. Robert Bateen found after comparing the

prior and current medical evidence of Huft's mental impairments, including Dr. Webber's report, that her cognition had improved to a degree that would allow her to return to work. (Doc. 7-9, at 75). The state agency physicians who assessed Huft's physical abilities similarly identified limitations consistent with the ability to perform a range of medium work, and the ALJ gave them great weight in the residual functional capacity assessment. (Doc. 7-2, at 24; 7-9, at 83; 7-9, at 124).

The ALJ discussed the medical evidence described above in his decision, and substantial evidence supports his finding of medical improvement.

### B.    Medical Opinions

Huft argues the ALJ did not give proper weight to the opinion of treating psychologist Dr. Nancy Errebo.

A treating physician's opinion is entitled to greater weight than that of an examining physician on the basis that he has a "greater opportunity to observe and know the patient." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). The weight given a treating or examining physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d)(2).

Dr. Errebo saw Huft a total of four times between March and April 2013, for

her PTSD.   (Doc. 7-9, at 138-39).  Dr. Errebo summarized their visits in writing, and stated in conclusion that Huft had "been experiencing moderate to severe PTSD since 2002 which has clearly compromised her social and occupational functioning."  (Doc. 7-9, at 139). The ALJ considered Dr. Errebo's opinion, including her statement that Huft's social and occupational functioning was compromised, but did not explain how much weight he afforded it.  (Doc. 7-2, at 22).

Huft argues the ALJ erred by failing to specify how much weight he was giving Dr. Errebo's opinion. But because the ALJ found that Huft's PTSD was a severe impairment and accommodated for PTSD-related limitations, any such error was harmless.  See *Stout v. Commissioner Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (error is harmless where it is "nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion").   By definition, a severe impairment is one that significantly limits the claimant's ability to perform basic work activities.  Thus, by finding that Huft's PTSD was a severe impairment, the ALJ accepted that it compromised her social and occupational functioning to some degree.

This is reflected in the ALJ's discussion, wherein he found that Huft had

moderate difficulties in social functioning and moderate difficulties with concentration, persistence or pace. (Doc. 7-2, at 18). The ALJ accounted for those limitations in the residual functional capacity assessment by restricting Huft to work involving simple, repetitive tasks and not requiring her to adequately respond to frequent changes in the workplace. See e.g. *Rogers v. Commissioner of Social Security*, 2011 WL 445047, at *11-12 (E.D. Cal. Jan. 25, 2011)( residual functional capacity assessment limiting a claimant to simple, repetitive tasks adequately accounts for moderate limitations in social functioning); *Stanley v. Astrue*, 2010 WL 4942818 *5 (E.D. Cal. Nov. 30, 2010) (residual functional capacity assessment limiting a claimant to simple, routine, repetitive tasks adequately accounts for moderate limitations in concentration, persistence, or pace). The ALJ adequately considered Dr. Errebo's opinion, and any error on his part in not specifically explaining the weight he afforded it was harmless.

### C.    Other Source Evidence

Huft contends the ALJ erred by not giving more weight to the opinion of nurse practitioner Beth McGee.

Nurse practitioners are defined as "other sources," not acceptable medical sources. Huft cites *Taylor v. Commissioner Soc. Sec. Admin.*, 659 F.3d 1228,

1234 (9th Cir. 2012) for the proposition that a nurse practitioner who works closely with a physician may qualify as an acceptable medical source. But because there is no indication that McGee worked closely with a supervising physician, she is properly considered an "other"source.

Other sources can provide evidence about the severity of a claimant's impairments and how they affect the claimant's ability to work. *See* 20 C.F.R. § 404.1513. While an ALJ must provide specific and legitimate reasons based on substantial evidence to discount evidence from an "acceptable medical source," evidence from an "other source" like McGee is not entitled to the same deference and may be discounted if the ALJ provides germane reasons for doing so. *Molina v. Astrue*, 674 F.3d 1104, 1111-12 (9th Cir. 2012).

McGee is a nurse practitioner with Montana Neurology, and treated Huft between November 2010 and September 2011. (Doc. 7-8, at 198-223). In January 2014, McGee completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on which she indicated that Huft's mental impairments caused marked limitations in several categories. (Doc. 7-10, at 38-40). McGee also completed a headache questionnaire on which she stated that Huft has migraine headaches three to four times a week, each lasting between two and 72

hours. She stated that Huft would not be able to work during her headaches, and would have to lie down and sit quietly. (Doc. 7-10, at 42-47).

The ALJ considered McGee's medical source statement and headache questionnaire but gave them only partial weight for two reasons. First, the ALJ found that both opinions conflicted to an extent with her own treatment notes, which more often than not reflected unremarkable physical examinations and showed significant progress with treatment until Huft's disability benefits were brought up for review. (Doc. 7-2, at 25-26). The ALJ summarized McGee's treatment notes elsewhere in his decision. (Doc. 7-2, at 19). When Huft saw McGee for the first time in November 2010, she reported frequent migraine headaches, dizziness, and shoulder pain. Huft's physical examination was unremarkable, and when she returned for a follow up appointment the next month, she reported that her newly prescribed medication eliminated her migraines and completely relieved her shoulder pain. (Doc. 7-8, at 207-09). By February 2011, Huft stated that her headaches had decreased significantly and her physical examination was essentially normal. (Doc. 7-8, at 205). In April 2011, Huft continued to report fewer headaches and less shoulder pain, and findings on physical examination were once again essentially normal. (Doc. 7-8, at 202-04).

In September 2011, McGee noted that Huft had apparently been notified that her disability benefits were under review, and she reported having more frequent headaches and increased shoulder pain. (Doc. 7-8, at 199). The ALJ permissibly found that the extreme limitations McGee identified on the medical source statement and headache questionnaire were not entirely consistent with her treatment notes which, for the most part, reflected that Huft physical examinations were normal and her headaches and shoulder pain improved with treatment.

Second, the ALJ discounted McGee's opinion regarding the disabling severity and frequency of Huft's headaches because her responses in the headache questionnaire appeared to rely quite heavily on Huft's subjective reports, and McGee "seemed to uncritically accept as true most, if not all, of what" Huft reported. (Doc. 7-2, at 25). As discussed below, the ALJ provided sufficiently clear and convincing reasons for finding Huft less than entirely credible. Having done so he permissibly discounted McGee's opinion to the extent it was based on Huft's subjective complaints. See *Bray v. Comm'r of Soc. Sec.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (explaining that where the ALJ has properly determined that a claimant's description of her limitations was not entirely credible, the ALJ could reasonably discount a physician's opinion "that was based on those less than

credible statements.").

These were sufficiently germane reasons for giving McGee opinions only partial weight.

### D.    Credibility

Huft argues the ALJ did not provide sufficiently clear and convincing reasons for finding her only partially credible.  If the ALJ finds "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged," and "there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citations omitted).  Huft met this initial burden because she provided evidence that she has underlying impairments that could reasonably be expected to produce some degree of pain and other symptoms, and the ALJ did not find that she was malingering.

The ALJ considered Huft's testimony, but found her less than entirely credible for a number of reasons. First, he pointed out that she had not received the type of medical treatment that would be expected for a totally disabled individual.

(Doc. 7-2, at 22).  In particular, the ALJ found it significant that there were virtually no medical records for the period between 2005, when Huft was awarded disability benefits, and 2010.  The ALJ permissibly questioned Huft's credibility based on the fact that she apparently received little medical treatment for her allegedly disabling impairments during the five year period after she was awarded disability benefits.  See *Burch v Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("The ALJ is permitted to consider lack of treatment in his credibility determination.")*; Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (stating that "evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding the severity of an impairment").

The ALJ further noted that when Huft did seek medical attention, she appeared to respond very well to treatment.  As the ALJ discussed elsewhere in his decision, medical records after 2010 reflect that while Huft suffered some setbacks, her migraines and shoulder pain responded well to treatment.  In July and August 2012, for example, Huft was showing improvement, her migraines were much less intense, and her pain was over 80% better.  (Doc. 7-9, at 109-10).  The ALJ permissibly discounted Huft's subjective testimony in part because the record reflects that Huft's symptoms improved with treatment. See e.g. *Warre v. Commissioner*, 439 F.3d 1001, 1006 (9th Cir. 2006); *Morgan v. Commissioner of*

*Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).

The ALJ also cited evidence that Huft worked after 2005, albeit not at the level of substantial gainful activity, as another reason for finding her less than entirely credible. In particular, the ALJ noted that Huft had assisted at her mother's day care program and performed some data entry work for a friend's business in 2011. The ALJ properly found this evidence undermined Huft's testimony to the extent she alleged she was unable to work. See *Bray v. Commissioner of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009).

The ALJ also considered the fact that Huft seemed preoccupied with losing her disability benefits, as noted by several medical providers. For example, Huft remarked to Dr. Webber in March 2012 that she made only $10.00 an hour for her typing work, and focused on comparing how much she could earn doing that work with how much she received from her disability and medicare benefits. (Doc. 7-9, at 29-30). See *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992) (ALJ permissibly considered "well documented motivation to obtain social security benefits" when evaluating the claimant's credibility).

The ALJ further found that Huft's allegations regarding the frequency and severity of her headaches and dizzy spells simply were not supported by the record. For instance, Huft testified that she gets daily migraines that last a couple

of hours and experiences dizziness in the mornings. But she did not mention any problems with dizziness when Dr. Harrison performed his neuropsychological evaluation in August and September 2012, and when she was placed on prescription migraine medications she reported that her headaches decreased to just two a month in February 2011.

The Court finds that these were sufficiently clear and convincing reasons for finding Huft less than entirely credible.

### E.    Lay Witness

Huft argues the ALJ erred because he did not provide germane reasons for discounting third-party function reports provided by her mother and friend. (Doc. 7-6, at 128, 146).  Huft's mother wrote that Huft has short term memory problems, suffers from dizziness, and has frequent headaches that "keep her down for days." (Doc. 7-6, at 146). Huft's friend similarly wrote that Huft has memory problems, headaches, and difficulty with daily activities.  (Doc. 7-6, at 128).

It is well-established in the Ninth Circuit that the "ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Commissioner*, 454 F.3d 1050, 1053 (9th Cir. 2006) (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 2003); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e)).  "If the ALJ wishes to discount the testimony of lay witnesses, he must

give reasons that are germane to each witness." *Stout*, 454 F.2d at 1053 (quoting *Dodrill*, 12 F.3d at 919). Competent lay witness testimony "cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).

The ALJ considered the two third-party function reports at issue but gave them little weight on the ground that they included extreme limitations that were not consistent with the medical evidence. This was a germane reason for discounting their statements. See *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (stating that "[i]nconsistency with medical evidence" is one "germane" reason for rejecting lay witness testimony).

Even if the ALJ erred by not explaining his reasoning more thoroughly, any error was harmless. Where, as here, the ALJ provides clear and convincing reasons for rejecting the claimant's own subjective complaints, and the lay witness testimony is similar to the claimant's complaints, any error in failing to discuss the lay testimony is harmless. See *Valentine v. Commissioner Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (upholding rejection of family member's testimony, which was similar to the claimant's, for the same reasons given for rejection of the claimant's testimony); *Molina v. Astrue*, 674 F.3d 1104, 1115-17 (9th Cir. 2012). Because the ALJ gave clear and convincing reasons for rejecting Huft's subjective complaints, and the lay witness statements largely reiterated those subjective

complaints, any error on the ALJ's part in failing to more specifically reject those statements was harmless.  *See Valentine*, 574 F.3d at 694.

### F.     Medical Expert

Huft argues the ALJ erred by not eliciting testimony from a medical expert regarding her mental impairments.  Citing the Commissioner's Hearings, Appeals, and Litigation Manual ("HALLEX"), Huft maintains expert testimony was necessary to interpret medical test results in the record.  HALLEX requires medical expert testimony if "there is a question about the accuracy of medical test results, requiring evaluation of background medical test date."  HALLEX I-2-5-34(A)(1).  Here, there is nothing in the record suggesting there is a question about the accuracy of the medical test data. Thus, the HALLEX section Huft relies on did not require the ALJ to obtain testimony from a medical expert.

Huft also argues medical testimony was necessary to determine whether she had experienced medical improvement. (Doc. 14, at 27).  Whether to consult a medical expert is within the discretion of the ALJ.  20 C.F.R. § 404.1527(f)(2)(iii).  The record contains several medical opinions addressing and interpreting the medical evidence, including those provided by Dr. Harrison, Dr. Webber, and the state agency physicians. The ALJ reasonably relied on the medical opinions already in the record for purposes of evaluating medical improvement, and Huft

has not shown the ALJ abused his discretion by not calling a medical expert.

### G. Vocational Expert

Finally, Huft argues the ALJ's hypothetical to the vocational expert was flawed because it did not incorporate all of her physical and mental limitations. As discussed above, the ALJ provided clearly and convincing reasons for finding Huft only partial credible, and properly weighed the medical evidence in finding that Huft had experienced medical improvement. Substantial evidence of record supports the ALJ's residual functional capacity assessment, which adequately accounted for Huft's physical and mental limitations. *See Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (the ALJ need not include limitations not supported by substantial evidence). Huft's residual functional capacity was in turn reflected in the hypothetical question he posed to the vocational expert.

## VI. <u>Conclusion</u>

For all of the above reasons, the Court concludes that the ALJ's decision is based on substantial evidence and free of legal error. Accordingly,

IT IS ORDERED that the Commissioner's decision is affirmed.

DATED this 8th day of June, 2017

Jeremiah C. Lynch
United States Magistrate Judge